UNITED STATES of America, Plaintiff-Appellee,

v.

Robert D. HARDIN, Defendant-Appellant.

No. 81–1967.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 6, 1983.

Decided June 23, 1983.

Rehearing Denied July 22, 1983.

Certiorari Denied Oct. 17, 1983.

See 104 S.Ct. 286.

**1232**

Kenneth N. Flaxman, Chicago, Ill., for defendant-appellant.

Maureen DeMaio, Asst. U.S. Atty., Dan K. Webb, U.S. Atty., Chicago, Ill., for plaintiff-appellee.

* The Honorable Edward R. Neaher, Senior District Judge for the Eastern District of New York, is sitting by designation.

Before CUMMINGS, Chief Judge, POSNER, Circuit Judge, and NEAHER, Senior District Judge.*

NEAHER, Senior District Judge.

Defendant-appellant Robert D. Hardin and his co-defendant, James F. Parker, were charged in a one-count indictment with possessing, with intent to distribute, approximately 344.31 grams of a cocaine mixture in violation of 21 U.S.C. § 841(a)(1). Prior to trial, both defendants filed motions to suppress certain statements and physical evidence on the grounds that the evidence had been obtained through, or derived from, an unlawful search and seizure conducted by Drug Enforcement Administration ("DEA") agents. Pursuant to 28 U.S.C. § 636(b)(1)(B), both motions were referred by the district court to a United States magistrate for an evidentiary hearing. The district court, after reviewing the findings and recommendations of the magistrate as well as the transcript of the hearing, ruled that all the evidence had been seized pursuant to a valid consensual search, and denied the motions. Following a three-day jury trial, both defendants were found guilty as charged. Only Hardin appeals the judgment of the district court.

**I.**

Hardin's initial contentions on appeal challenge the district court's denial of his motion to suppress an airplane ticket and travel materials which contained information linking him to the cocaine. Specifically, he claims that the court abused its discretion under 28 U.S.C. § 636(b)(1)(B) by refusing to afford him a *de novo* hearing on the disputed issues of fact that arose during the evidentiary hearing before the magistrate. In addition, he contends that the district court erred in ruling that the search in question was within the parameters of his consent. Since both claims are factual in nature, a somewhat detailed recitation of

the evidence is necessary for their resolution.

The relatively uncontested testimony adduced at the suppression hearing revealed that on June 10, 1980, agents of the Florida Department of Law Enforcement informed the Chicago office of the DEA that two suspected drug couriers would be arriving from Fort Myers, Florida, on Eastern Airlines flight 230 carrying a brown attache case and a plaid suitcase. Acting on this information, members of the DEA and the Chicago Police Department were stationed in and around Eastern Airlines Gate D–3 to look for and monitor the conduct of the suspects. At approximately 10:30 A.M., the agents observed Parker and Hardin as they exited the plane; both men matched the physical descriptions provided by the Florida authorities and Parker was carrying a brown attache case. The agents followed Parker and Hardin as they walked alternately together and apart towards the main terminal. When they reached the end of concourse D, Parker transferred the attache case to Hardin and, after entering a washroom, both men proceeded together down the escalator to the Eastern Airlines baggage claim area.

In a pattern similar to their behavior on the upper level concourse, defendants met, conversed, separated, met again, talked and separated. Finally, Hardin walked towards the United Airlines baggage area, leaving Parker at the Eastern Airlines baggage carousel. While Hardin observed from a distance, Parker approached the carousel, examined a plaid suitcase and picked it up. Both men then proceeded towards the exits.

At that point, DEA Special Agent Anderson and Chicago Police Officer Burzinski approached Hardin, identified themselves, and asked if they could have a word with him. Parker, meanwhile, exited the terminal and walked towards the United Airlines exit doors. When he observed Hardin talking with Anderson and Burzinski, he forced his way through the people coming out of the electrically-controlled exit doors and stood in the alcove between the inner and outer doors, apparently observing this "strange" turn of events. After 20–25 seconds, he again left the terminal and walked towards the taxi stand where he was intercepted by DEA Special Agents Valentine, Hillebrand, O'Brien, Fulkerson and Whittington.

At some point in the discussions with Parker, Agent Valentine noticed that the suitcase which Parker was carrying bore the name of "Peter Scott." Parker asserted that he knew of no one by that name and posited that he must have picked up the wrong luggage. Agent Valentine suggested that they return to the baggage area to look for Parker's luggage, and Parker agreed. After a short time, however, Parker abandoned the search for his bag and asked if he could leave the terminal. The agents told him that he could, but the suitcase would be detained. After Parker left the terminal, a United States Customs Service detection dog alerted the agents to the presence of narcotics in the suitcase.

While the events surrounding the seizure of the suitcase and the discovery of the cocaine were largely uncontested, the circumstances leading up to the uncovering of the incriminatory airplane ticket and travel documents found in Hardin's clothing were hotly disputed. According to the testimony of the DEA agents involved, Hardin, like Parker, chose to cooperate with the investigation. The DEA agents testified that when first approached, Hardin gave the agents his name, produced corroborative identification, and attempted to explain that he was traveling alone from Birmingham, Alabama. Agent Anderson testified that after Hardin was unsure whether his flight had been non-stop, and was unable to produce an airplane ticket, he asked Hardin if he would consent to a search of his attache case, and Hardin cooperated by opening the case for the agents. The search, however, failed to uncover the ticket or any evidence of a criminal nature.

At that point, Agent Whittington approached and, according to his testimony, asked Hardin whether the airplane ticket might be among papers protruding from Hardin's shirt pocket. Both Police Officer Burzinski and Agent Whittington testified that Hardin replied to this question by sim-

ply handing the papers to Agent Whittington. While the papers did not include the airplane ticket, they did contain travel information for a round-trip flight between Fort Myers, Florida and Chicago for an individual named "P. Scott," so Whittington asked Hardin who Mr. Scott was and Hardin replied that he did not know. Agent Whittington, however, recognized the name as corresponding to the one found on the suitcase Parker was carrying, and he asked Hardin whether he knew Parker, who by then was standing with other DEA agents at the Eastern Airlines baggage counter. Hardin claimed that he did not, but that he might have seen him in the washroom in the main terminal.

Agent Whittington then asked Hardin whether he would consent to a pat-down search for narcotics, and, according to Whittington's testimony, Hardin, with his arms raised, responded: "No go ahead. I'm clean." As Whittington conducted the pat-down, he encountered what he later described as hard paper in Hardin's back pocket, and, without removing it, he asked Hardin what the item was. In response, Hardin placed his right hand over Agent Whittington's left hand, and said, "Oh that must be my airline ticket." Hardin then brought the ticket out of his pocket and handed it to Agent Whittington, who noticed that the ticket, like the travel information and the suitcase containing the cocaine, bore the name of Peter Scott.

Hardin's version of the events, however, was quite different. He claimed that the agents ordered him to stop, refused to explain why he was being questioned, and when he attempted to leave, Officer Burzinski informed him that he was under arrest. He also testified that he never told the agents his travel itinerary and consistently refused to make a statement. Finally, he asserted that he never voluntarily consented to the pat-down search and never handed the agents the papers from his shirt pocket, or the ticket from his pants pocket. Rather, he contended that Agent Whittington pulled the papers out of his shirt pocket, and that either Whittington or Agent O'Brien yanked the airplane ticket from his pants pocket.

In resolving the conflicting versions of the circumstances surrounding the discovery of the airplane ticket and the travel document, the magistrate concluded that "the agents' testimony of the events at the stops of Hardin and Parker [were] more credible than those given by the defendants." Thus, based on the testimony of the DEA agents, the magistrate recommended to the district court that Hardin's motion to suppress be denied on the grounds that Hardin had knowingly and voluntarily consented to the search of his clothing. Prior to ruling, the district court requested and received specific findings of fact from the magistrate, and granted Hardin leave to file objections. After considering the magistrate's report and proposed findings as well as Hardin's objections, the district court concluded that the "findings and recommendations [were] supported by substantial evidence" and denied the motion.

## II.

Hardin's contention that the district court abused its discretion under 28 U.S.C. § 636(b)(1)(B) is premised on the court's adoption of the magistrate's credibility-based factual determinations without actually hearing the conflicting testimony. He claims that the factual dispute about whether he consented to the search of his clothing, in itself, required the court to exercise its discretion to rehear the testimony before ruling on the motion. Alternatively, he asserts that certain discrepancies in the testimony of the DEA agents as well as what he calls the "suspicious circumstances" surrounding the search indicated that the DEA's testimony was less than truthful, thus undermining the magistrate's credibility ruling. He argues that under these circumstances the magistrate's ruling was entitled to no deference and consequently the district court was required to actually hear the testimony.

■ The first prong of this argument—that the conflict in the testimony mandated a *de novo* hearing—was rejected by five members of the Supreme Court in *United States v. Raddatz*, 447 U.S. 667, 100 S.Ct.

2406, 65 L.Ed.2d 424 (1980). Writing for the majority, Chief Justice Burger gave constitutional validity and literal effect to the language of § 636(b)(1)(B), which calls for "a de novo *determination* of those portions of the report or specified proposed findings or recommendations to which objections are made," not a *de novo* hearing. *Id.* at 676. Quoting the House Judiciary Committee report, the Court found the congressional intentions quite explicit:

> " 'The use of the words "de novo determination" *is not intended to require the judge to actually conduct a new hearing* on contested issues. Normally, the judge, on application, will consider the record which has been developed before the magistrate and make his own determination on the basis of that record, without being bound to adopt the findings and conclusions of the magistrate. In some specific instances, however, it may be necessary for the judge to modify or reject the findings of the magistrate, to take additional evidence, recall witnesses, or recommit the matter to the magistrate for further proceedings.' H.R.Rep. at 3, U.S.Code Cong. & Admin.News 1976, p. 6163." *Id.* at 675, 100 S.Ct. at 2412 (emphasis in original).

Finally, addressing the precise problem posed by Hardin's contention, the Court, again quoting the legislative history of the statute, concluded that

> " '[i]f [the district court] finds there is a problem as to the credibility of a witness or witnesses or for other good reasons, *it may, in the exercise of its discretion,* call and hear the testimony of a witness or witnesses in an adversary proceeding. It is not required to hear any witness and not required to hold a *de novo* hearing of the case.' H.R.Rep. at 3–4 (emphasis added), U.S.Code Cong. & Admin.News 1976, p. 6163, quoting 501 F.2d, at 206." *Id.* at 676, 100 S.Ct. at 2412 (footnote omitted).

Consequently, under *Raddatz,* the district court was not required to rehear the testimony simply because a factual dispute existed in the record and accordingly Hardin's contention must be rejected.

■ The second prong of Hardin's challenge—that the circumstances surrounding the search as well as discrepancies in the testimony given by the DEA agents required a rehearing—is similarly controlled by the *Raddatz* decision. *Raddatz* made it clear that the district court, in making its *de novo* determination of the record, could afford the magistrate credibility findings " 'such weight as [their] merit commands and the sound discretion of the judge warrants.' " *Id.* at 683, 100 S.Ct. at 2416 (quoting *Mathews v. Weber,* 423 U.S. 261, 275, 96 S.Ct. 549, 556, 46 L.Ed.2d 483 (1976)). Thus, on appeal, the district court's decision to adopt the magistrate's credibility rulings without hearing the testimony can only be said to be abuse of discretion if the record reflects that those rulings were themselves clearly erroneous and entitled to no weight.

■ In this case, the magistrate's credibility ruling was not only amply supported by the record, but those portions of the record cited by Hardin to undermine that ruling are simply unpersuasive. First, the record is replete with instances where Hardin's version of the events was directly contradicted by the testimony given by Parker, his own co-defendant; and, indeed, Hardin's own testimony concerning the search was itself inconsistent: during direct testimony he testified that Agent Whittington pulled the ticket out of his back pocket, while on cross-examination, he insisted that Agent O'Brien actually removed it. Second, the inconsistencies between Police Officer Burzinski's and Agent Whittington's description of the pat-down search, which Hardin cites as evidence of their untrustworthiness, were minor if not irrelevant: both testified that Hardin pulled the ticket out of his pocket; Burzinski's testimony only differed in her description of the location and movement of Hardin's hands during the search. Finally, the DEA agents' testimony that Hardin lied about his travel plans and spoke in sarcastic tones to the agents was not necessarily inconsistent with their subsequent testimony that he was cooperative and voluntarily consented to be searched. Indeed, Hardin's own testimony indicates such a vacillation in his atti-

tude towards the agents. In any event, this description of his conduct is neither so implausible or so suspicious as to render the magistrate's credibility rulings clearly erroneous.

### III.

Hardin's substantive fourth amendment claim attacks the district court's ruling that his consent to the pat-down search authorized the seizure of the airplane ticket. He contends first that, according to Agent Whittington's own testimony, his consent authorized only a limited pat-down search for narcotics, and therefore Agent Whittington exceeded the scope of his consent when he searched his pocket for the airplane ticket. Secondly, Hardin argues that, in any event, his conduct in placing his hand over Agent Whittington's manifested his intent to withdraw his consent. Neither contention has merit.

■ The parameters of a consensual search, like the question of the voluntariness of the consent itself, is an issue of fact that must be distilled from the totality of the circumstances surrounding the search. *United States v. Sierra-Hernandez,* 581 F.2d 760, 764 (9th Cir.), *cert. denied,* 439 U.S. 936, 99 S.Ct. 333, 58 L.Ed.2d 333 (1978); *see Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). Resolution of such factual questions is entrusted to the district court and will not be lightly overturned on appeal. *United States v. Sanchez-Jaramillo,* 637 F.2d 1094, 1098 (7th Cir.), *cert. denied,* 449 U.S. 862, 101 S.Ct. 166, 66 L.Ed.2d 79 (1980). In this instance, however, the scope of Hardin's consent was not raised during the suppression proceedings; and, consequently, neither the magistrate nor the district judge ruled on that specific issue. Nevertheless, the district court's conclusion that the ticket was seized pursuant to a valid consent necessarily includes a finding that Hardin's consent was broad enough to encompass the search in question, *see United States v. Sierra-Hernandez,* 581 F.2d at 764, and we see no reason not to afford this unarticulated factual conclusion similar deference on appeal. *Id.* The only question, therefore, is whether the district court's ruling, when viewed in light of the evidence adduced at the suppression hearing, was clearly erroneous. *United States v. Sanchez-Jaramillo, supra.*

■ Assuming arguendo that Hardin's consent to a pat-down search for narcotics did not authorize an internal search of his pockets or the inspection of documents discovered therein, the evidence provided by his subsequent statements and conduct during the search indicated his consent to a more expanded search with regard to the airplane ticket. Both Officer Burzinski and Agent Whittington testified that when Whittington noticed the papers in Hardin's rear pocket, Hardin expressed no concern and apparently made no attempt to exclude the pocket or its contents from the scope of the search; rather, he described what the papers were, and cooperatively handed the airplane ticket to Whittington. Although he did not then expressly invite the officers to examine the ticket, his conduct in presenting the ticket to the officers certainly indicated such an invitation. Thus, what might have begun as a limited search for narcotics expanded by consent to encompass the visual search of the airplane ticket. Accordingly, the district court's conclusion that the ticket was seized pursuant to a valid consensual search can hardly be called erroneous.

Hardin's alternative argument that he withdrew his consent before the airplane ticket was discovered is similarly contradicted by the evidence concerning his own conduct during the search. Indeed, it is unclear what argument he is making. If, on the one hand, he contends that by placing his hand over Whittington's, he intended to withdraw his original consent, as noted above, his contemporaneous actions in removing the ticket and presenting it to the officers provided new authority to view the ticket. If, on the other hand, he argues that this gesture indicated an objection to a search of the ticket, his outward manifestations implied a contrary meaning. In either case, the gesture, when viewed in the context of his other actions, was at best ambiguous, and given his general cooperative attitude during the search, wholly ineffective

to communicate an intention to rescind or narrow his consent.

## IV.

■ Hardin's final contention is that the district court erred in admitting into evidence, pursuant to the hearsay exception for public records, Fed.R.Evid. 803(8), a graph from a DEA statistical report which purported to show the average retail price and purity of illicit cocaine in the United States. Over Hardin's hearsay objection, the graph was used to demonstrate that the 344.31 grams of 87% pure cocaine seized from the defendants, when diluted to the average retail purity, had an approximate "street" value of $212,680. This evidence was relied on by the government as circumstantial proof of defendant's intent to distribute the cocaine.

Hardin reiterates here his trial contention that the graph was inadmissible under Rule 803(8), or indeed under any other exception to the hearsay rule, because it represents, albeit in statistical form, "matters observed by police officers or other law enforcement officials." Fed.R.Evid. 803(8)(B). The government concedes that the graph depicts data compiled by DEA personnel pursuant to their statutory mandate to extirpate the drug trade in the United States, and that the price and quality data were derived from DEA purchases and seizures of illicit cocaine between 1977 and 1980. The government contends, however, that the graph was admissible under either Rule 803(8)(A) as a "data compilation of an agency setting forth ... the activities of the agency," or under Rule 803(8)(B) as a record of routine police observations.

We agree that the graph in question was properly admitted under Rule 803(8) as a record, report or data compilation setting forth an activity of the DEA within the meaning of subsection (A) of that rule. The conversion into statistical form of the average price and purity of illicit cocaine purchased by DEA agents over a period of years not only reflects the agency's activity but is important to its understanding of the market it polices and the efficient performance of its regulatory duties. That the observations of DEA agents in the field are

the ultimate source of the data does not affect admissibility. The compilation of such information for the non-litigative purpose of identifying national trends in the illicit drug market provides little incentive for misrepresentation by these agents. Moreover, the government's need and obligation to define its regulatory mission with accuracy clothe the report with inherent reliability, while its preparation for congressional review subjects it to public scrutiny for veracity. Under these circumstances, we hold that the district court properly admitted the graph into evidence.

Judgment affirmed.