In the
United States Court of Appeals
For the Seventh Circuit

No. 00-3809

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

SHELBY LEMMONS,

Defendant-Appellant.

Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. 00-CR-14--David F. Hamilton, Judge.

Argued November 2, 2001--Decided February 27, 2002

   Before POSNER, RIPPLE, and EVANS, Circuit
Judges.

   EVANS, Circuit Judge.  Much like the
"interactive process" required of
employers and employees in cases
involving reasonable accommodations under
the ADA, a "consent" to search often
involves a little bit of give-and-take
between police and a person giving
permission for a search. Unraveling what
occurred during that exchange is the
stuff of suppression hearings in the
district court, and a judgment on what
happened (and what consequences flow from
what happened) is usually a very fact-
intensive inquiry. So it is in this case.

   This case comes to us after Shelby
Lemmons pled guilty to charges of using a
minor to engage in sexually explicit
conduct for the purpose of producing a
videotape in violation of 18 U.S.C. sec.
2251(a) (Count I) and, on the basis of
three computer images, possessing
computer files containing depictions of
minors engaged in sexually explicit
conduct in violation of 18 U.S.C. sec.
2252A(a)(5)(B) (Count II). Lemmons'
guilty pleas were conditioned on his
ability to air, on appeal, his claim that
the district court erred in denying his
motion to suppress.

   Our case starts in a trailer park where

Lemmons lived in a trailer assigned to "Space 66." The chain of events started when Lemmons' next-door neighbor, a woman living in trailer "Space 65," called the Bloomington (Indiana) police department to report seeing a camera lens on her trailer that should not have been there. It was pointed toward her bedroom. Jeff Canada, a Bloomington police officer, responded to the complaint and traced a cable wire attached to the intruding camera. It led straight to Lemmons' trailer.

Bloomington Detective Anthony Pope soon arrived on the scene. Pope knew Lemmons (Lemmons greeted Pope saying, "What's up, Tony?"), who on previous occasions cooperated with the Bloomington police by making controlled drug buys for them. Pope knocked on Lemmons' door and told him about his neighbor's complaint. Pope said he wanted to talk to Lemmons about the incident. Lemmons agreed and Pope and Canada came in, as did two officers who arrived earlier. Pope told Lemmons that he wanted to search the trailer to make sure that Lemmons didn't have any recordings of goings-on in his neighbor's bedroom. After a back-and-forth about whether Pope had a warrant (he didn't), Lemmons volunteered to get some recordings. He started to move toward his bedroom, but Pope stopped him and pulled out a consent-to-search form. While going over the form with Lemmons, Lemmons asked Pope if he could talk to him alone. Pope asked the other officers to leave. Lemmons then told Pope that there were things in his trailer that he did not want Pope to find. He mentioned that he had some marijuana. Pope said the police were not worried about that; they were there to investigate the camera and recordings. Lemmons also mentioned that he had a crack pipe. Pope then told Lemmons he would not "bargain things away" and that Lemmons needed to decide whether to consent to a search. Lemmons then signed the form after Pope read its contents to him. Pope also read Miranda warnings to Lemmons.

According to Pope, Lemmons handed him some pictures, saying, "You're going to want to see these too, but they're legal." Pope described the pictures as being of a female in her late teens; in some of the pictures she was partially nude. He thought the pictures were

sexually provocative. Lemmons also pointed out some videotapes. Canada went to review the tapes on Lemmons' VCR.

Pope next searched a front room in the trailer that resembled an office. There, Lemmons pointed out some Polaroids. One of them, Lemmons said, was a picture of his 17-year-old daughter. According to Pope, the girl in the picture was wearing a shirt and underwear and was in a "here I am" type pose. Pope pointed to a computer in the room and asked Lemmons if there was anything on it that Pope needed to be aware of. According to the district court findings, Lemmons told Pope that he could look if he wanted and turned on the computer for Pope. When the computer came on, Pope recognized a program involving photographs. He pulled up the program and turned it on. Using it, he found on the hard drive images containing child pornography. He estimated that there were over 100 images, with the subjects ranging in age from 5 to their late teens. Standing either beside or a few feet behind Pope as he reviewed the images, Lemmons said, "It's not what you think." He claimed that the images had been sent to him by other people.

Pope had another officer drive Lemmons to the police station. Canada told Pope that the tapes he reviewed included a female about 5 years old in a bathtub. Another video contained a female in her teens engaging in sexual conduct with Lemmons.

An hour or so later, Pope interviewed Lemmons at the police station. Lemmons admitted taping his neighbor's bedroom window. He also claimed that the 5-year-old on the tape was his granddaughter and that he had taped her. He acknowledged the videotape of the other teenager with him and admitted that he was responsible for the computer images, which he had traded with other people over the Internet. Lemmons was not arrested after all this talk-- Pope simply drove him back to the trailer park and dropped him off.

Pope contacted Special Agent Robert Molina of the FBI and informed him of what he had found. Molina believed the material fit the definition of child pornography under federal law. The next day Molina accompanied Pope back to

Lemmons' trailer, where they obtained more admissions involving Lemmons' use of the Internet and the mail to trade child pornography. Lemmons also consented toanother search./1 While searching, Molina found more incriminating items.

Lemmons argues on appeal that the Bloomington police exceeded the scope of his consent while searching his trailer. Unfortunately, his argument in the district court focused on whether his consent was involuntary. His motion to suppress did not pointedly contest the scope issue. Only patches of Lemmons' testimony touched the issue and even then only in response to questions from the government. At the end of the hearing, Lemmons' argument made only cursory allusions to "a fairly general search" and "a general rummaging." In sum, we think Lemmons did not raise the issue of the scope of consent before the district court./2

The more important question is what effect that has on our review. Lemmons claims it has none, citing United States v. Hardin, 710 F.2d 1231 (7th Cir. 1983). Hardin was also a case where the defendant had not raised the scope of consent issue before the district court but challenged only the voluntariness of a consent. Id. at 1236. We held that the district court's conclusion with regard to voluntariness "necessarily include[d] a finding that . . . consent was broad enough to encompass the search in question." Id. We doubt that Hardin gives a free appellate pass (and a potential remand to the district court) to any defendant who fails to raise a scope of consent argument in a case involving the voluntariness of consent. But in Hardin we found enough of a factual record to make our review possible. The same is true here. Accordingly, we will assume that the district court's voluntariness holding necessarily included an unarticulated finding that the consent given was broad enough to cover the scope of the subsequent search./3 On a district court's denial of a motion to suppress, we review the district court's factual findings for clear error and questions of law de novo. United States v. Chaparro-Alcantara, 226 F.3d 616, 620 (7th Cir. 2000).

The first task is defining the scope of

Lemmons' consent, at least initially. The scope of consent is defined by gauging, under the totality of the circumstances, what a "typical reasonable person" would have understood it to be. Florida v. Jimeno, 500 U.S. 248, 251 (1991). "The scope of a search is generally defined by its expressed object." Id.; United States v. Saadeh, 61 F.3d 510, 518 (7th Cir. 1995). Pope gained access to Lemmons' trailer by saying that he needed to talk to him about his neighbor's complaint about videotaping. When he was inside, Pope said that he "needed to . . . search his home and make sure that he didn't have any recordings of her bedroom window inside." Lemmons replied, "I'll be honest with you, I've got some recordings in here and I'll go get 'em for you." After Pope called Lemmons back, Lemmons said that he had "some videotapes" but also some other things that Lemmons did not want the police to see. Pope responded, "I'm here to investigate the camera and some recordings." Lemmons then volunteered to get his videotapes. A reasonable observer would clearly understand these exchanges as centering on recordings of the neighbor's bedroom window.

The government claims that when Lemmons signed the consent form, a somewhat standardized one which contained general language authorizing a search of his "premises," he consented to an unlimited search (with a side agreement granting Pope immunity for any marijuana that turned up). We reject that argument in this case. It would sanction deception to hold that, despite Pope's assurances, Lemmons consented to an unlimited search when he signed the consent form. Although the consent form is probative of the voluntariness of Lemmons' consent, it helps little in determining its scope. In light of Pope's statements that he wanted to look for a camera or recordings of the neighbor's window, we conclude that Lemmons initially consented to a search only for those items. As such, the officers would have been limited to searching in only those areas in which that evidence could reasonably have been expected to be found. Cf. United States v. Dichiarinte, 445 F.2d 126, 130 (7th Cir. 1971).

But Lemmons' consent was built on shifting sands. He continued to expand its boundaries as the police proceeded

through his trailer. Just as a warrantless search can be authorized by consent, the scope of a search can be expanded by consent. Hardin, 710 F.2d at 1236 (finding that a pat-down search for narcotics was "expanded by consent" when a suspect described papers protruding from his pocket and handed them to the officer). Because Lemmons concedes that the videotapes were lawfully searched for and seized pursuant to his original consent, the only evidence directly challenged is the photographs and the images found on the computer./4 The undisputed testimony indicates that once the search began, Lemmons started showcasing his photographs as though they were vacation souvenirs. Pope testified that Lemmons handed the first set of pictures to him, saying, "You're going to want to see these too, but they're legal." In his office, Lemmons pointed out Polaroids, which included a picture of a 17-year-old girl. A policeman need not avert his eyes to what a suspect voluntarily puts before them. There is no evidence disputing Pope's testimony with regard to the pictures, and they were lawfully searched pursuant to Lemmons' consent.

That leaves the images found on the computer, three of which formed the basis for the second count of the indictment. To recap, Pope went to the computer after the police found the videotapes (but before Canada relayed their content to Pope) and after Lemmons showed him the pictures in the bedroom and office. A search of the computer at that point would probably have exceeded the scope of Lemmons' original consent. A camera or recording was not likely to be found by turning on a computer. Moreover, there is no indication that Pope believed that the wire leading from the neighbor's trailer had somehow recorded on the computer. Whether provocative pictures of (late) teenage girls, both clothed and unclothed, would have furnished probable cause for a warrant authorizing a search of the computer for child pornography may be debatable.

It is also academic because Pope never had to seek a warrant. The district court found that Lemmons told Pope he could search his computer, which he even turned on for Pope. Although Lemmons testified that he told Pope not to go on the

computer, there is nothing to suggest the district court committed clear error by crediting Pope's testimony. When Pope asked, on the heels of viewing Lemmons' pictures, whether there was anything on the computer that he needed to be aware of, Lemmons invited Pope to check. Although Lemmons testified that Pope "controlled" the computer, there is no evidence that Lemmons protested while he was standing (at most) 4 feet behind Pope as he located images on the computer. Instead, he said, "It's not what you think," and claimed that the images were sent to him by other people. Pope described Lemmons as "very cooperative" and "calm" when he turned the computer on for Pope. Based on the evolving exchanges between Lemmons and Pope, Lemmons consented to a search of his computer for pornographic images./5

We emphasize that Lemmons took affirmative steps to aid the officers in their search and that there is no evidence that the officers forced Lemmons to expand the scope of his initial consent. He was calm and cooperative throughout the process; he also had prior experience with Pope and the police department. Knowing they already had incriminating videotapes (even if Pope did not yet know their precise contents), it's a good bet Lemmons hoped to curry favor with Pope by cooperating. Whatever the case, Pope did not act unreasonably by finding evidence of criminality in a place to which he was granted access.

Lemmons cites two cases supposedly contrary to our holding. Although neither deals with this case's unique facts, they are worth comparing. In United States v. Carey, 172 F.3d 1268 (10th Cir. 1999), the police obtained a warrant authorizing them to search computer files for evidence "pertaining to the sale and distribution of controlled substances." Id. at 1270. Acting under the warrant, an officer located files with sexually suggestive titles and the label "jpg," denoting an image. Id. Although the officer testified that he did not know what the label meant originally, after looking at the first file and discovering child pornography, he nonetheless downloaded over 200 other files. Id. at 1271. The court did not suppress the first file, which the officer stumbled onto inadvertently, but did suppress the

succeeding files. Id. at 1273 n.4. The files were not in plain view because "the contents of the files and not the files themselves" were seized. Id. at 1273. Moreover, the officer had testified that after viewing the first file, "each time he opened a subsequent JPG file, he expected to find child pornography and not material related to drugs." Id.

In United States v. Turner, 169 F.3d 84 (1st Cir. 1999), the police obtained consent to search an apartment for evidence of an assault of a neighbor. The police told the resident, whom they were beginning to suspect was the assailant, that they wanted to look for evidence of the assault. With the suspect remaining on the first floor, officers began a 90-minute search of the second floor. A detective on the second floor noticed a computer suddenly turn on; a photograph of a nude woman appeared on the screen. Believing that the woman resembled the assault victim, he sat down at the computer and accessed the "used files" index on the toolbar, which displayed several files labeled "jpg." Clicking on these files, he found several pictures of nude women in bondage. He later searched the hard drive and found files entitled "young" and "young with breasts." Opening one of these files, he discovered child pornography. The court suppressed the evidence, holding that the search of the computer files exceeded the scope of the consent given.

Neither Carey nor Turner dealt with the evolving consent at issue here. In Carey, the officer was confined by the strict language of the warrant; in Turner, the officer was confined by the boundaries of the original consent, which were never expanded to include a computer search. By contrast, Lemmons accompanied the police around his trailer, inviting them to look at different things. Had Lemmons stuck to his initial consent limiting the police to search for a camera or recordings of his neighbor, the computer search would have been illegal. Had Lemmons consented to the search of the computer, but only for computer images of his neighbor, Pope's search of the computer may also have been illegal, depending on the details of Lemmons' labeling system and other variables. But Lemmons did not limit Pope in either manner. Rather, after (lawfully) viewing

photographsraising suspicions of child pornography, Pope asked Lemmons whether there was anything he needed to be aware of on the computer. Lemmons responded by inviting him to look on the computer and then turning it on for him. There is no evidence that he limited Pope's subsequent search of the files or protested when Pope accessed them. He instead explained to Pope that the images belonged to other people. Accordingly, Pope was not exceeding the scope of Lemmons' consent when he uncovered pornographic images on the computer.

Upon this record, the decision denying Lemmons' motion to suppress will not be disturbed. The judgment of the district court, therefore, is AFFIRMED.

FOOTNOTES

/1 The district judge found that Lemmons' consent to the search on the second day was voluntary and Lemmons does not challenge that finding on appeal. Nor does he appear to be arguing that the second search, which turned up the videotape charged in the first count of the indictment, exceeded the scope of the consent given on that day. Even if he was, there is no indication that his consent to that search was limited in any manner. Accordingly, unless the search the previous day tainted the second search, the motion to suppress was properly denied.

/2 Lemmons' reply brief alludes to an argument that he had ineffective assistance of counsel. This argument did not appear in his opening brief and therefore was waived for purposes of direct appeal.

/3 Even if Hardin did not apply, it seems likely that Lemmons did not waive his scope of consent argument below but merely forfeited it. "[A] forfeiture is an accidental or negligent omission . . . while a waiver is the manifestation of an intentional choice not to assert the right." United States v. Cooper, 243 F.3d 411, 416 (7th Cir. 2001). Forfeited arguments are reviewable, but only for plain error. Id. at 415 (noting that forfeited arguments are reviewable for plain error but waived arguments are not); Fed. R. Crim. P. 52(b). There is no indication in the record that Lemmons' trial counsel affirmatively indicated that he was not going to challenge the search's scope. He simply did not raise it. Accordingly, counsel's omission would not affect whether we can review the district court's decision but rather the standard of review we apply.

/4 Based on the asserted illegality of the searches, Lemmons also seeks to suppress his subsequent statements at the police station.

/5 We do not rely, as the government suggests we could, on the plain view doctrine to justify Pope's viewing of Lemmons' computer files. From Pope's testimony, it seems clear that the files were not in plain view. Pope had to access them by opening a program and looking on the hard drive for pornographic images.