NONPRECEDENTIAL DISPOSITION
To be cited only in accordance with
Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued August 7, 2013
Decided October 4, 2013

**Before**

FRANK H. EASTERBROOK, *Circuit Judge*

DANIEL A. MANION, *Circuit Judge*

MICHAEL S. KANNE, *Circuit Judge*

No. 13-1003

| | |
|---|---|
| UNITED STATES OF AMERICA, <br>     *Plaintiff-Appellee,* <br><br>     *v.* <br><br> DONALD ANDERSON, <br>     *Defendant-Appellant.* | Appeal from the United States District Court for the Northern District of Illinois, Eastern Division. <br><br> No. 09 CR 754-1 <br><br> Joan B. Gottschall, *Judge.* |

**O R D E R**

Donald Anderson was under investigation for sexual assault of a child when he gave the police written consent to search his home and take "whatever documents or items of property whatsoever they deem pertinent to their investigation." The officers seized computers and a memory card; photographs on the memory card prompted further searches (with warrants) and led to federal charges. Anderson moved to suppress the items taken during the consensual search (and everything seized in the later searches as fruits of that initial search). He raised two claims but presses only one of them on appeal: His consent to search did not extend to his computers or storage media. After the district court rejected that contention, Anderson entered a conditional guilty plea and was sentenced to 50 years' imprisonment. We affirm the judgment.

In March 2007 a mother in Norridge, Illinois, reported to police that her 12-year-old daughter was missing. The girl turned up less than an hour later and she said she had been in nearby Park Forest at the home of a family friend, Anderson, who was then 42. That information prompted a referral to police in Forest Park. The girl was twice interviewed by Park Forest officers, the first time by Commander Brian Tas and the second by Detective Jim Varga. She eventually disclosed to Varga that Anderson had sex with her on more than one occasion.

Two days after interviewing the girl, Detective Varga went to Anderson's home with two other officers and invited him to the police station. At the station Anderson confessed to having sex with the girl and signed the written "Permission to Search" his home. The officers returned to the house and removed several computers and the memory card, which was plugged into one of those computers. Later examination of the memory card revealed photographs of the 12-year-old posing naked and kissing Anderson. The police then obtained a search warrant and recovered bedding, a love letter from the girl to Anderson, more computers and storage media, and cameras. The storage media held additional child pornography, which led to a second search warrant targeting VHS cassettes and other storage media that had been left behind at the house. One VHS tape from 1997 depicts Anderson having sex with a different girl, who was 8 years old at the time. Her mother unfortunately trusted him to care for her daughter.

Anderson pleaded guilty in state court to predatory criminal sexual assault of the 12-year-old, *see* 720 ILCS 5/11-1.40, and was sentenced to 16 years in prison. Federal authorities then charged him with sexual exploitation of the 8-year-old, *see* 18 U.S.C. § 2251(a), and with receipt and possession of child pornography, *see id*. § 2252A(a)(2).

In his motion to suppress, Anderson asserted that, before he gave consent to search, Park Forest officers already had entered his home without authorization and removed from a digital camera a second memory card which, like the one plugged into the computer, held pictures of the 12-year-old. That conduct, Anderson argued, tainted his consent. And even if it did not, his consent did not authorize the seizure of computers and storage media. Anderson claimed that the consent form that he signed limited the scope of his consent to search property "pertinent" to the sexual-assault investigation. He insisted that what the police took was not pertinent to his sexual assault of the 12-year-old girl.

The district court conducted an evidentiary hearing on Anderson's motion and accepted filings from the parties. These submissions include an investigative report authored by Commander Tas and Detective Varga. In that report Tas recounts that, when he interviewed the 12-year-old, she said she had been communicating with Anderson for more than a year by e-mail and instant messaging. Tas briefed Varga, who then interviewed the girl and her mother. Varga recounts that the girl's mother had said she asked Anderson, who ran a computer business, to counsel her daughter about use of the social-networking website MySpace. Anderson did so and even warned her that pedophiles on the Internet take advantage of young girls.

At the evidentiary hearing, Anderson's account of an initial warrantless search of his house contradicted the testimony from the police witnesses (Detective Varga and the two officers who accompanied him on the first visit to Anderson's home). Anderson maintained that, when the police first came to his home, the two officers with Varga restrained him on the porch while the detective entered the house without permission and grabbed the camera and its intact memory card. Varga and his two colleagues all denied entering Anderson's home before he gave written consent.

Detective Varga also testified that when Anderson was interviewed at the police station he acknowledged communicating with the 12-year-old by e-mail and instant messaging.  Varga claims that's why he looked for computers during the consensual search of Anderson's home. When questioned by defense counsel, Varga denied that at the time he interviewed Anderson he knew or had reason to believe that the defendant had photographed the girl.

During the hearing Anderson never asserted that he had qualified his consent or that he was told or led to believe that the police officers did not deem computer equipment or digital storage media to be "pertinent" to their investigation of his sex crime. Neither did any of the three police officers say this. In fact, there was no testimony from any witness about conversation between Detective Varga and Anderson after the detective had read the consent form to Anderson and presented it for review and signature. Anderson did assert that he failed to comprehend the form because he was having a panic attack. Yet one of the officers who searched Anderson's house with Varga testified that he witnessed Anderson sign the consent form and did not perceive him to be confused or panicked.

The district court believed the police officers, not Anderson. The court found that, before conducting the consensual search of Anderson's home, the officers already

knew that he and the girl had communicated over the Internet. With that, the court concluded that the computers and memory card taken during the consensual search were relevant to the sexual-assault investigation and within the scope of Anderson's consent. Accordingly, the court denied the motion to suppress.

On appeal Anderson no longer asserts that the police seized the digital camera and its memory card (or anything else) before he signed the consent form. His appeal instead hangs on the contention that the police exceeded the scope of his consent. Anderson insists that the  consent form, by its terms, authorized the police to search only for property "pertinent" to their sexual-assault investigation. In his view, that did not include the computers and memory card. He thinks those items would have been relevant only if Detective Varga had known before asking for consent that Anderson and the girl had communicated over the Internet. Anderson insists that since Varga did not know about the electronic communications, the district judge must have been speculating that Varga was privy to what Commander Tas learned while interviewing the victim. Anderson's rendition of the facts and the applicable law is incorrect.

The consent form authorized the police to seize "whatever documents or items of property whatsoever they deem pertinent to their investigation." Broad language in a standardized consent form, like that here, must be read in the context of the interactions between the suspect and police that surrounded the execution of the form. *See United States v. Breit*, 429 F.3d 725, 729–30 (7th Cir. 2005); *United States v. Lemmons*, 282 F.3d 920, 924 (7th Cir. 2002). The scope of consent is measured objectively, with a focus on the object of the search as represented to the suspect. *Florida v. Jimeno*, 500 U.S. 248, 251 (1991); *United States v. Jackson*, 598 F.3d 340, 348 (7th Cir. 2010).

There wasn't any testimony at the evidentiary hearing, nor has Anderson ever contended, that he or the police officers expressly narrowed the scope of the writing. The officers did not, for instance, tell Anderson they were searching only for specific evidence. *See Lemmons*, 282 F.3d at 924 (limiting scope of consent when police told suspect they were looking for camera or recordings of neighbor's window). Still, before the officers presented him with the form, they had been questioning Anderson exclusively about his sexual relationship with the girl. One might think that if Anderson signed the consent, the police would search only for evidence reasonably related to the sexual assault being investigated. *United States v. Coleman*, 588 F.3d 816, 820 (4th Cir. 2009) (explaining that crime being investigated, a shooting, was relevant in determining scope of consent); *United States v. Turner*, 169 F.3d 84, 87–89 (1st Cir. 1999) (same for assault investigation); LaFave, *supra*, § 8.1(c) at 26 ("[G]eneral consent is constrained by the bounds of reasonableness . . . ."). Even the government accepts that the written consent could not have been unlimited.

That said, Anderson's premise that Detective Varga didn't know that internet communications had occurred is both factually incorrect and irrelevant. It wasn't only Commander Tas's interview of the victim that established that she communicated with Anderson over the internet. Varga testified that Anderson admitted during the stationhouse interview that he had talked with the girl online. And as noted previously, Varga recounts in the investigative report that he personally learned from the girl's mother about her use of MySpace. Putting aside that Varga testified that he *discussed* the investigation with Tas, the two officers belonged to the same police force, so the doctrine of collective knowledge imputes Tas's information to Varga. *See United States v. Hensley*, 469 U.S. 221, 231 (1985); *United States v. Williams*, 627 F.3d 247, 252 (7th Cir. 2010). It should have been no surprise when the police officers seized the computers while investigating Anderson's relationship with the 12-year-old. *See Breit*, 429 F.3d at 730–31 (concluding that consent to search for guns "or anything related to them" encompassed notebook and journal that might have contained inventory of guns or plans to use them); *United States v. Raney*, 342 F.3d 551, 558 (7th Cir. 2003) (explaining that consent to search for evidence "in the nature of" narcotics encompassed drug paraphernalia, scales, and drug ledgers).

Morever, even if the record supported Anderson's contention that the police knew nothing of his internet communications with the victim, digital media have become so ubiquitous in the 21st century that rarely will storage devices *not* be "pertinent" in an investigation of the sexual assault of a child. As the Sentencing Commission has observed, "In recent years, the number of still images and videos memorializing the sexual assault and other sexual exploitation of children, many very young in age, has grown exponentially as the result of changes in technology." U.S. Sentencing Comm'n, *Federal Child Pornography Offenses* 3 (2012), *available at* http://www.ussc.gov/Legislative_and_ Public_Affairs/Congressional_Testimony_and_Reports/Sex_Offense_Topics/201212_Fed eral_Child_Pornography_Offenses/Chapter_01.pdf. And it is common for sex offenders to use computers to communicate with their victims online. Edward M. Marsico, Jr., *Social Networking Websites: Are MySpace and Facebook the Fingerprints of the Twenty-First Century?*, 19 Widener L.J. 967, 967–69 (2010); Elizabeth P. Stedman, *MySpace, but Whose Responsibility?: Liability of Social-Networking Websites When Offline Sexual Assault of Minors Follows Online Interaction*, 14 Vill. Sports & Ent. L.J. 363, 364, 372–74 (2007); Kate Knibbs, *Sexual Assault in the Digital Age*, Mobiledia (July 17, 2012), http://www.ramadan.com/mobil/sexual-assault-in-the-digital-age.html. Further, the form Anderson signed authorized police to seize "documents"; many documents are now created and saved on computers, so the love letter the police found easily could have been discovered as a saved e-mail, online chat, or social-networking post in a browsing history. Accordingly, cameras and computers were objectively pertinent to

the investigation of Anderson's sexual assault of the 12-year-old, with or without prior knowledge of actual online communications.

The scope of consent is measured objectively, without consideration of the policeman's private, subjective intent. *United States v. White*, 706 F.2d 806, 808 (7th Cir. 1983); LaFave, *supra*, § 8.1(c) at 23. For that reason, Anderson is incorrect in assuming that it matters if the police all along meant to search for child pornography and thus took his computers before seizing physical evidence of the sexual assault (such as the bedding recovered later). Similarly irrelevant are Anderson's abandoned assertions of confusion and anxiety, as the perspective of a "typical reasonable person"—not a person with (if it is to be credited) a panic disorder—is what matters. *See Jimeno*, 500 U.S. at 251; *United States v. Saucedo*, 688 F.3d 863, 866, 868 (7th Cir. 2012) (considering what a "reasonable person would have understood" despite defendant's assertion that illness affected his ability to understand scope of consent).

**AFFIRMED**.