In the

# United States Court of Appeals

## For the Seventh Circuit

No. 13-1710

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

$304,980.00 IN UNITED STATES CURRENCY, et al.,

*Defendants.*

APPEAL OF: RANDY DAVIS and DELORES DAVIS, Claimants.

Appeal from the United States District Court for the
Southern District of Illinois.
No. 3:12-cv-00044-MJR-SCW — **Michael J. Reagan**, *Judge.*

ARGUED SEPTEMBER 17, 2013 — DECIDED OCTOBER 17, 2013

Before WILLIAMS, SYKES, and TINDER, *Circuit Judges.*

TINDER, *Circuit Judge.* This is an action for civil forfeiture of a tractor-trailer and $304,980 in cash that was found hidden in a secret compartment within it. The claimants, Randy and Delores Davis, moved in the district court to suppress the results of the search, arguing that it violated their Fourth

Amendment rights because it was conducted without consent or probable cause. The district court denied the motion, finding that Randy Davis consented to the search of the truck. The Davises subsequently acknowledged that they had no other defense to the forfeiture; thus, they agreed to the entry of a stipulated forfeiture order subject to their right to appeal the denial of their motion to suppress, an appeal that is now before us. Because the district court did not clearly err in finding that Randy Davis consented to the search, we affirm.

## I.    Background

On August 26, 2011, at around 2:15 in the afternoon, Randy Davis was driving his Peterbilt tractor-trailer westbound on Interstate 70 through southern Illinois toward St. Louis, Missouri. At the time, Davis was running his own trucking company, and he shared ownership of the company's only truck with his wife, Delores Davis. Like many tractor-trailers, Davis's truck had a sleeping compartment with a recessed area in the floor designed to hold a mattress. But unlike most tractor-trailers, Davis's truck had a hinged piece of plywood installed over that recessed area, raising the mattress to floor level and creating a hidden compartment beneath it. And on this particular afternoon, Davis was hiding $304,980 in cash under his mattress.

Near mile marker twenty-four, Davis passed an unmarked police vehicle that was parked in the median of the interstate. Inside the vehicle were Kevin Thebeau and Derek Hoelscher, city police officers who had been assigned to a DEA drug interdiction task force. As part of their duties on the task force, Officers Thebeau and Hoelscher would make traffic stops in an effort to obtain probable cause or consent

to search vehicles suspected of being used to transport drugs or drug money.

After Davis passed their vehicle, the officers pulled out into westbound traffic and followed. A few miles down the road, they observed Davis following too closely to the tractor-trailer in front of him, and they initiated a traffic stop. Davis took the exit at mile marker twenty-one and pulled over on the right side of the exit ramp.

After Davis pulled over, the officers got out of their vehicle and approached the cab of his truck from the passenger side. Officer Thebeau took the lead and spoke with Davis, telling him the reason for the stop and asking for his driver's license, logbook, and bill of lading. Davis provided his driver's license and logbook but explained that he did not have a bill of lading because he had just dropped off a load in Vandalia and was now empty. Thebeau advised Davis that the officers would issue a warning for the traffic violation. Then, the officers returned to their vehicle with the documentation Davis provided.

Back in their vehicle, the officers examined Davis's logbook and started to grow suspicious. They noticed that Davis had gone without work for much of July and August, and they wondered how a one-man operation could stay afloat during that time. They also noticed that Davis had expensive aftermarket parts on his truck, and they wondered how he could afford them given his intermittent work schedule. With their suspicion already aroused, the officers contacted the El Paso Intelligence Center and learned that Davis's truck was on a "watch" because it had been used in criminal activity in the past. Based on all of this information,

the officers decided to seek Davis's consent to search the truck.

The officers again approached the truck's cab from the passenger side, and Officer Thebeau asked Davis to step outside. Davis complied and walked around the front of the truck to join the officers on the passenger side, using his remote to lock the truck on his way (out of habit). Thebeau asked Davis if he was carrying any drugs or large sums of money, and Davis responded that he was not. Thebeau then asked Davis if he would consent to a search of his truck, and Davis unequivocally gave his consent, saying something to the effect of "yes, go ahead."[1]

After obtaining Davis's oral consent, Officer Thebeau handed Davis a written consent form and asked him to read it and sign it. Davis then attempted to open the passenger door for Thebeau but discovered that it was locked. In response, Thebeau either said he would walk around to the driver's side or began to walk around, at which point Davis used his remote to unlock the truck for him. Thebeau then entered the driver's door and began his search.

As Thebeau began searching, Davis began reading the consent form, which stated that he would consent to the search of his truck, "including luggage, containers, and con-

---

[1] In the suppression hearing, Davis denied giving oral consent to the search. However, the district court found the officers' testimony more credible. Because it was not "physically impossible" for the officers to have heard Davis give consent, or "impossible under the laws of nature" for Davis to have given it at all, we defer to the district court's credibility determination. *United States v. Bowlin*, 534 F.3d 654, 662 (7th Cir. 2008) (quoting *United States v. Ortiz*, 431 F.3d 1035, 1039 (7th Cir. 2005)).

tents of all. This includes the removal of any suspicious paneling or other vehicle components, and the least intrusive access to any constructed compartment used for the purposes of concealing contraband."

Officer Hoelscher, who had remained outside, noticed that Davis appeared to be struggling with the form. So, Hoelscher asked him if he needed help understanding it. Davis did not answer, but he appeared to grow agitated, and he asked Hoelscher what the officers were looking for. Hoelscher responded that they were looking for drugs or large sums of money derived from drugs. At that point, Davis noticed Hoelscher's city police department badge, and he asked Hoelscher what the officers were doing out there. Hoelscher explained that they were part of a DEA task force; then he again asked Davis whether he needed any help understanding the form. However, Davis remained unresponsive. Hoelscher noted that he could stop the search and get a drug dog, but Davis still did not respond.

Wanting to be sure of Davis's consent, Hoelscher walked around to the driver's side of the truck and told Thebeau to stop the search because Davis would not sign the form. Thebeau then stuck his head out of the truck and asked Davis whether they still had his consent to search. In response, Davis grabbed the form from Hoelscher, wrote something on it, and gave it back.[2] Hoelscher glanced at the form, saw

---

[2] In the suppression hearing, both officers testified that Davis said "I'll sign it" as he grabbed the form from Officer Hoelscher. However, Davis testified that he simply grabbed the form, wrote on it, and gave it back. The district court never made a specific finding on this issue. Thus, we will assume that Davis said nothing when he grabbed the form.

what appeared to him to be a signature, and put it in his pocket.

Believing Davis had signed the form, Thebeau continued his search. Meanwhile, Davis and Hoelscher went back around to the passenger side of the truck and engaged in casual conversation. Davis appeared to relax, and he told Hoelscher that he assumed the officers knew he had been in trouble before. In fact, Hoelscher was unaware of any prior arrests, so he asked Davis to elaborate, at which point Davis volunteered that he had previously been arrested for possessing 200 pounds of marijuana.

Eventually, Thebeau noticed that Davis's mattress was sitting flush with the floor of the sleeping compartment, unlike the mattresses in trucks he had searched in the past. So, he decided to look under the mattress, at which point he saw the plywood lid that had been constructed over Davis's secret compartment. Thebeau then used a screwdriver to pry the lid up far enough to grip with his hand, opened the compartment, and found the cash.

After Thebeau's discovery, the officers took Davis into custody and seized the truck and the cash. A few days later, however, they examined the consent form more closely and discovered that rather than signing his name on the signature line, Davis had written the words "UNDER PROTEST," in a somewhat elaborate script, along with his initials.

Although the officers obtained a positive reaction to the seized money from a drug dog, Davis was subsequently released. However, the government kept the truck and the cash and filed this action for civil forfeiture.

## II.    Standing

As an initial matter, the government argues that even if the district court erred in denying the Davises' motion to suppress, we should affirm because the Davises do not have Article III standing to contest the forfeiture. Although the government did not file a cross-appeal, we will consider its argument because "[t]he federal courts are under an independent obligation to examine their own jurisdiction, and standing 'is perhaps the most important of [the jurisdictional] doctrines.'"[3] *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990) (quoting *Allen v. Wright*, 468 U.S. 737, 750 (1984)) (second alteration in original). Moreover, we must address this issue first because without a case or controversy under Article III, we have no authority to proceed to the merits. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998).

The government argues that because the Davises have failed to prove their ownership of the seized cash, they do

_____

[3] The government argues that a cross-appeal was unnecessary because standing is an alternative ground to affirm the judgment. However, "[a]n appellee who wants, not that the judgment of the district court be affirmed on an alternative ground, but that the judgment be changed, [such as] from a dismissal without to a dismissal with prejudice, must file a cross-appeal." *Am. Bottom Conservancy v. U.S. Army Corps of Eng'rs*, 650 F.3d 652, 661 (7th Cir. 2011). And even in the civil forfeiture context, a dismissal for lack of standing is different from a judgment on the merits. *See United States v. Funds in the Amount of $574,840*, 719 F.3d 648, 651–52 (7th Cir. 2013) (discussing the res judicata effect a ruling on standing in a civil forfeiture case). Therefore, we decline to consider the government's standing argument as an alternative ground to affirm the judgment in this case.

not have Article III standing.[4] However, to have standing, a claimant need not "establish that a right of his has been infringed; that would conflate the issue of standing with the merits of the suit." *Aurora Loan Servs., Inc. v. Craddieth*, 442 F.3d 1018, 1024 (7th Cir. 2006). Instead, "he must have a colorable *claim* to such a right." *Id.* While it is true that the Davises have not proved their ownership of the cash (indeed, they invoked the Fifth Amendment in response to the government's interrogatories on that subject), they do *claim* such ownership, and the money was found in Randy Davis's possession. This is sufficient to give them a colorable claim to the money. *See United States v. $148,840.00 in U.S. Currency*, 521 F.3d 1268, 1273–78 (10th Cir. 2008) (a claim of ownership coupled with possession was sufficient to establish standing even though the claimant invoked the Fifth Amendment and refused to explain his ownership interest). Therefore, the Davises have Article III standing, and we turn to the suppression issue.

---

[4] The government does not dispute the Davises' ownership of the truck, nor does it dispute that some of the cash could have come from the Davises' legitimate earnings. It merely maintains that their earnings were insufficient to allow them to save $304,980 since their bankruptcy in 2003. If the Davises do own at least some of the cash, the question of how much "has a damages flavor to it, which is a merits, not a standing, question." *Scanlan v. Eisenberg*, 669 F.3d 838, 845 (7th Cir. 2012). But more fundamentally, as discussed in this section, the Davises have standing to contest the forfeiture of the cash regardless of whether they can prove that they own any of it.

### III.    Motion to suppress

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures … ." While the Amendment "says nothing about suppressing evidence obtained in violation of this command," *Davis v. United States*, 131 S. Ct. 2419, 2426 (2011), the Supreme Court has adopted a prudential rule requiring such suppression in order to "compel respect for the constitutional guaranty," *id.* (quoting *Elkins v. United States*, 364 U.S. 206, 217 (1960)). As the district court in this case noted, there is some debate as to whether the common-law exclusionary rule should apply in civil-forfeiture proceedings. *See, e.g.*, *United States v. Marrocco*, 578 F.3d 627, 642–43 (7th Cir. 2009) (Easterbrook, J., concurring). However, Rule G(8)(a) of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions provides that "[i]f the defendant property was seized, a party with standing to contest the lawfulness of the seizure may move to suppress use of the property as evidence." This rule, like others promulgated pursuant to the Rules Enabling Act, has the force of a statute. *In re Dorner*, 343 F.3d 910, 914 (7th Cir. 2003) (citing 28 U.S.C. § 2072(b)). Thus, regardless of whether the common-law exclusionary rule applies, we must determine whether the district court should have granted the Davises' motion to suppress under Rule G(8)(a).

In reviewing a district court's denial of a suppression motion, "factual findings are reviewed for clear error, and legal conclusions and the ultimate determination of reasonableness are subject to de novo review." *United States v. Stokes*, 726 F.3d 880, 890 (7th Cir. 2013). "A factual finding is clearly erroneous only if, after considering all the evidence, we can-

not avoid or ignore a definite and firm conviction that a mistake has been made." *United States v. Jackson*, 598 F.3d 340, 344–45 (7th Cir. 2010) (quoting *United States v. Burnside*, 588 F.3d 511, 517 (7th Cir. 2009)) (internal quotation marks omitted).

The Fourth Amendment prohibits only "unreasonable searches and seizures." Although a warrant is often required to make a search reasonable, certain warrantless searches are also reasonable, including those conducted with the suspect's consent. *Illinois v. Rodriguez*, 497 U.S. 177, 183–84 (1990). However, not all consents are the same, and no consent is irrevocable. *See Florida v. Jimeno*, 500 U.S. 248, 252 (1991) ("A suspect may of course delimit as he chooses the scope of the search to which he consents."); *United States v. Jachimko*, 19 F.3d 296, 299 (7th Cir. 1994) (consent may be withdrawn). "Clearly a person may limit or withdraw his consent to a search, and the police must honor such limitations." *United States v. Dyer*, 784 F.2d 812, 816 (7th Cir. 1986).

Whether a suspect consented to a search is a question of fact that we review for clear error. *United States v. Williams*, 209 F.3d 940, 942–43 (7th Cir. 2000). The consent inquiry focuses on "what is reasonably apparent to a reasonable inquiring officer" so as to further the deterrence rationale of the exclusionary rule. *United States v. Grap*, 403 F.3d 439, 444 (7th Cir. 2005).

In this case, we have little difficulty concluding that Davis initially consented to the search of his truck. When Officer Thebeau asked for his consent, Davis readily gave it, saying something to the effect of "yes, go ahead." Then, he attempted to open the passenger door for Officer Thebeau, only to find it locked. When Officer Thebeau decided to

walk around to the driver's side, Davis used his remote to unlock the truck for him. Under these circumstances, a reasonable officer would have believed that Davis consented to the search of his truck. Moreover, Davis does not contend that his consent was involuntary. Therefore, the search was reasonable and complied with the Fourth Amendment so long as it remained within the scope of Davis's general, oral consent and so long as he did not subsequently limit that scope or withdraw his consent altogether.

"Whether a search remains within the scope of consent 'is a question of fact to be determined from the totality of all the circumstances.'" *United States v. Saucedo*, 688 F.3d 863, 865 (7th Cir. 2012) (quoting *Jackson*, 598 F.3d at 348). "The standard for measuring the scope of consent under the Fourth Amendment is one of objective reasonableness and asks what the typical reasonable person would have understood by the exchange between the law enforcement agent and the person who gives consent." *Id.* (quoting *Jackson*, 598 F.3d at 348).

"The scope of a search is generally defined by its expressed object." *Id.* (quoting *Jimeno*, 500 U.S. at 251). Consent to a general search includes consent to search "anywhere within the general area where the sought-after item could be concealed." *Id.* at 866 (quoting *Jackson*, 598 F.3d at 348–49). Moreover, "[w]hen a person is informed that an officer is looking for drugs in his car and he gives consent without explicit limitation, the consent permits law enforcement to search inside compartments and containers within the car, so long as the compartment or container can be opened without causing damage." *Id.* (quoting *United States v. Calvo-Saucedo*, 409 F. App'x 21, 24 (7th Cir. 2011)).

In this case, just before asking for Davis's consent to search, Officer Thebeau asked Davis whether he was hauling any drugs or large sums of money. Thus, Davis was aware of what the officers were looking for from the beginning. Moreover, during the search, Officer Hoelscher expressly told Davis that the officers were looking for drugs or large sums of money derived from drugs, and as discussed below, Davis did not limit the scope of the search after Officer Hoelscher told him what the officers were looking for. Given the expressed object of the search and Davis's general consent, the officers were permitted to look in any compartments where drugs or money could be found, so long as they did not cause damage. And while Officer Thebeau used a screwdriver to lift the plywood lid of Davis's secret compartment, there is no evidence that this caused any damage to the lid or to Davis's truck. Therefore, the search was within the scope of Davis's general, oral consent, and the search was reasonable so long as Davis did not subsequently withdraw or limit the scope of that consent.

Like the question whether consent was given at all, the question whether the suspect subsequently withdrew or limited the scope of his consent is a question of fact that we review for clear error. *See United States v. Maldonado*, 38 F.3d 936, 941–42 (7th Cir. 1994). In this case, Davis argues that by writing "UNDER PROTEST" on the consent form, he withdrew or limited the scope of his oral consent.

With respect to scope, Davis's argument is far from clear. He seems to suggest that by rejecting the form he refused to expand the scope of his oral consent to include hidden compartments. However, as discussed above, his general, oral consent already included hidden compartments, so such an

expansion was unnecessary. He also seems to suggest that by rejecting the form, he revoked his consent to search those specific areas listed in the form that were also covered by his general, oral consent. But for the reasons discussed below, his conduct was insufficient to withdraw his consent either generally or in relation to specific areas. Therefore, Davis never limited the scope of his consent.

The government relies on case law from the Eighth Circuit for the proposition that "[a] defendant must make an unequivocal act or statement to indicate that consent is being withdrawn." *United States v. Parker*, 412 F.3d 1000, 1002 (8th Cir. 2005). While our cases have not explicitly required as much, they are consistent with this approach. *See, e.g., United States v. Hardin*, 710 F.2d 1231, 1236–37 (7th Cir. 1983) (holding that the defendant's act of placing his hand over the officer's "was at best ambiguous, and given his general cooperative attitude during the search, wholly ineffective to communicate an intention to rescind or narrow his consent").

Moreover, we find support for the rule in the Supreme Court's admonition that "the ultimate touchstone of the Fourth Amendment is 'reasonableness.'" *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006). If a suspect's attempt to withdraw consent is equivocal, "police officers may reasonably continue their search in the premises entered pursuant to the initial grant of authority." *United States v. McMullin*, 576 F.3d 810, 815 (8th Cir. 2009). Put another way, police officers do not act unreasonably by failing to halt their search every time a consenting suspect equivocates.

In this case, Davis never unequivocally withdrew his consent. Indeed, the very act he relies upon would have led

a reasonable officer to believe that he was affirming, rather than withdrawing, his consent. When asked whether he still consented to the search, Davis grabbed the consent form from Officer Hoelscher, wrote something on it, and gave it back without saying a word. This act would have led an objective observer to believe that Davis had signed the form and affirmed his consent.

Davis argues that the officers chose the means by which he could communicate his consent (i.e., through the consent form); therefore, he should not have been required to object to the search in any other way, and the officers were unreasonable in failing to closely scrutinize the form to ensure that he had in fact signed it. However, the officers did not communicate with Davis exclusively or even primarily in writing. They asked him whether he consented, and Officer Thebeau relied upon his oral consent and began the search before Davis even read the form. Moreover, Officer Hoelscher did look at the form, and seeing two words written on the signature line, believed Davis had signed it. We have examined the form and find Officer Hoelscher's belief to be a reasonable one. An officer who was unfamiliar with Davis's signature and who had no reason to believe that Davis would have written anything but his signature on the signature line could not reasonably have been expected to do more.

Finally, we note that Davis's conduct after he signed the form was wholly consistent with his consent and inconsistent with revocation or limitation of that consent. He engaged Officer Hoelscher in casual conversation and even volunteered that he had been in trouble with the law in the past. Thus, like the suspect in *Hardin*, Davis's conduct "was

at best ambiguous, and given his general cooperative attitude during the search, wholly ineffective to communicate an intention to rescind or narrow his consent." 710 F.2d at 1236–37.

## IV.    Conclusion

In sum, the district court did not clearly err in finding that Randy Davis orally consented to the search of his truck, that Davis never withdrew or limited the scope of that consent, and that the officers' search remained within the scope of that consent. Therefore, the district court properly denied Appellants' motion to suppress, and the judgment below is AFFIRMED.