No. 3--09--1028

_____

Filed June 10, 2010

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

A.D., 2010

| | | |
|---|---|---|
| In re R.W., | ) | Appeal from the Circuit Court |
| | ) | of the 10th Judicial Circuit, |
| a Minor | ) | Peoria County, Illinois, |
| | ) | |
| (The People of the State of | ) | |
| Illinois, | ) | |
| | ) | |
| Petitioner-Appellee, | ) | No. 09--JA--166 |
| | ) | |
| v. | ) | |
| | ) | |
| Rebekah W., | ) | Honorable |
| | ) | Kim L. Kelley, |
| Respondent-Appellant). | ) | Judge, Presiding. |

_____

JUSTICE McDADE delivered the opinion of the court:

_____

The trial court adjudged the minor, R.W., daughter of the respondent, Rebekah W., to be neglected because of an environment injurious to her welfare (705 ILCS 405/2--3(1)(b) (West 2008)). On appeal, the respondent argues that the court's decision to adjudge the child neglected was against the manifest weight of the evidence. We reverse and remand.

BACKGROUND

R.W. was born on April 18, 2002. On June 26, 2009, the Department of Children and Family Services (DCFS) filed a petition alleging that the minor was neglected because of an injurious environment, based on allegations:

"A) THERE HAVE BEEN TWO (2) PRIOR REPORTS TO DCFS FOR DIRTY

HOUSE CASES WHICH WERE UNFOUNDED AND A THIRD WAS CALLED IN MAY OF 2009, AND WHEN DCFS WENT TO THE HOME ON MAY 12, 2009 THE MOTHER WAS OUTSIDE, SAW THE WORKER AND RAN INSIDE AND REFUSED ENTRY AND WHEN DCFS WENT BACK ON MAY 22, 2009 THE MOTHER CAME OUT AND REFUSED ENTRY INTO THE HOME AND THE MOTHER ALLOWED ENTRY AFTER MAY 22, 2009 AND THE UPSTAIRS HAD BEEN CLEANED BUT WHEN THE WORKER TRIED TO GET INTO THE BASEMENT THEERE [sic] WAS NO WAY TO GET DOWN THE STAIRS AS IT WAS PACKED FULL OF ITEMS; AND

B) THER [sic] MOTHER IS A HOARDER WITH JUNK THROUGHOUT THE BACKYARD AND DCFS IS UNABLE TO ASCERTAIN THE CFONDITION [sic] OF THE BASEMENT DUE TO NO ACCESS AVAILABLE BECAUSE OF THE NUMEROUS ITEMS; HOWEVER, THE MINOR REPORTS THAT SHE PLAYS IN THE BASEMENT IN THE DIRTY WATER; AND

C) ON MAY 13, 2009, THE MOTHER WAS FINED BY CODE ENFORCEMENT FOR THE CONDITIONS OF THE HOME; AND

D) THE MOTHER REFUSES TO COOPERATE WITH DCFS."

The court held the adjudication hearing on October 1, 8, and 15, 2009. The respondent testified that, on March 16, 2000, after she married R.W.'s father, Rusty W., she moved into the home where he had been residing in Peoria Heights.

Rusty W. stated that after R.W.'s birth in 2002, the respondent's tendency to hoard items inside and outside the house increased. The porch and backyard became cluttered with items, many of which were duplicates and some of which were broken. When Rusty W. would attempt to throw away the duplicate and broken items, the respondent would become upset with him and

2

would attempt to retrieve the items he had thrown away. Rusty W. testified that the couple separated in April 2007, when he moved out of the house. The respondent testified that some of the items in the backyard belonged to Rusty W., who had not removed these belongings after the separation.

The respondent stated that in April and December 2008, DCFS workers came to her home with complaints about the house. Raelyn Galassi, a DCFS investigator, testified that the two DCFS reports in 2008 that the house was cluttered and unsafe were later determined to be unfounded after the respondent "cleaned up the home."

Cary Wamsley testified that he was the code enforcement officer and building inspector for the Village of Peoria Heights. He said that in October 2008, he had written the respondent a warning for a code violation concerning items stored on the front porch of the residence.

Galassi said that DCFS received a complaint on April 22, 2009, that "[t]here were concerns about the condition of the [respondent's] home, that there were rats outside and possibly inside of the home, that there was water in the basement and *** possibly some mold." Consequently, Galassi talked with R.W. at her school about the condition of the residence. According to Galassi, "[R.W.] stated that there was water in the basement on the floor, that it was *** brown, dirty water, and that she would play in it."

Wamsley said that, on an unspecified date, he had received a

complaint from one of the respondent's neighbors "stating they saw rodents coming from the [respondent's] property." Consequently, Wamsley went to the respondent's home on May 7, 2009, when he wrote the respondent a warning concerning the large amount of debris in the backyard and the driveway, tall grass and weeds in the backyard, debris stored on the front porch, and plastic covering the openings of the porch. Photographs were admitted in evidence showing these conditions. The warning also noted that the garbage and debris in the backyard was a hazard for rodent infestation. Because no one answered the door of the residence, Wamsley left the warning on the door.

Galassi stated that another DCFS worker went to the home on May 8, 2009, but no one was home. Galassi went to the house on May 11, 2009, and no one answered the door. When Galassi learned that R.W. was at home because she was sick on May 12, 2009, Galassi went to the home again. After Galassi parked her car, she saw the respondent come out of the house and "tie a dog up outside." When Galassi got out of her car, the respondent came out of the house, retrieved the dog, and went back inside the home. When Galassi knocked on the door several times, no one answered. Galassi observed that "[t]here was plastic that was covering like half of the porch and then there was just a lot of garbage and *** stuff piled up on the porch." Galassi stated that later on May 12, the respondent called her and said that she could return and look at the house. Galassi told the respondent that she would return to the house on May 13, 2009.

4

Galassi testified that when she returned on May 13, she was accompanied by Wamsley. Wamsley testified that he had returned to the house on May 13 to follow up on the warning he had written on May 7. On this occasion, Wamsley observed that the backyard was "[b]asically full of debris, garbage, junk, toys[,] plastic containers, cardboard boxes, debris strewn everywhere, tall grass and weeds." On May 13, Wamsley issued a citation to the respondent, fining her for failing to clean up the items that he had noted in the May 7 warning. A copy of the citation was admitted in evidence.

Galassi testified, that on May 13, she saw that there were several items stacked against the interior walls of the house. On this date, both Wamsley and Galassi were unable to view the basement because of the large number of items stacked in the basement's stairway. Galassi testified, however, that the upstairs of the house was clean. Wamsley stated that the blocked basement stairway was a safety hazard because it prevented access to the furnace and water heater in case of a fire. When Galassi told the respondent that she needed to view the basement, the respondent agreed to cooperate. Galassi told the respondent that she would return on May 22, 2009, to inspect the basement.

The respondent testified that on May 14, 2009, with the help of a friend, she cleared the stairs to the basement. She said that on May 15 and 16, 2009, she cleared the debris from the backyard. The respondent testified that thereafter, she kept the backyard mowed. The respondent also stated that in May 2009

5

water temporarily leaked into the basement because there had been excessive rainfall that spring. The respondent said that she and her friends mopped up the water in the basement.

Wamsley testified that on May 18, 2009, he returned to the home and found that the backyard had been cleaned up and that the home had no code violations. We note that Wamsley did not testify that he had ever observed either rats or evidence of rats on the respondent's property.

When Galassi returned on May 22, the respondent said that, on the advice of her attorney, she would not allow Galassi to inspect the home without a search warrant. Following the respondent's refusal to allow Galassi to inspect the home, Galassi presented Rusty W. with a DCFS safety plan that provided for the removal of R.W. from the respondent's care and prohibited Rusty W. from allowing R.W. to have contact with the respondent. We note that the record shows that DCFS took this action without having asked the trial court for either an emergency shelter care hearing (see 705 ILCS 405/5--501 (West 2008)) or any other order concerning R.W.'s custody.

Both Tina McKean and Sandra Lukehart testified for the respondent. Both women testified that they had helped the respondent clean and organize the house, including the basement. Both women testified that there was standing water in the basement that sometimes was clear and sometimes was muddy or dirty. The women also testified that they helped the respondent mop up the water.

6

At the conclusion of the adjudication hearing, the court announced its decision. The court considered that the respondent had a history of DCFS involvement, including two unfounded reports. The court found that the residence lacked a suitable environment for the minor, which DCFS had brought to the respondent's attention on numerous occasions. The court noted that, although the respondent took corrective actions on various occasions, the environmental problems were recurring.

The court observed that Wamsley had given the respondent an opportunity to correct the unsafe conditions in and around the house before citing her for code violations. The court further observed that the respondent had refused DCFS entry to the house on May 22, 2009. The court noted that the basement stairway had been blocked with items on at least one occasion, which was an unsafe condition. The court considered Rusty W.'s testimony that the respondent was a hoarder, which was corroborated by photographs of the porch and the backyard, as well as the testimony of several witnesses.

The court found that R.W.'s report to Galassi that she had played in dirty water in the basement was "corroborated" by the testimony of the respondent's witnesses that, at times, there was dirty water in the basement. The court found that, considering the totality of the circumstances, the State had proved by a preponderance of the evidence that R.W. was neglected because of an injurious environment.

The court issued its dispositional order on November 12,

7

2009.  In the order, the court found both the respondent and Rusty W. dispositionally fit and made both of them guardians of R.W.  The court made R.W. a ward of the court, assigned tasks to R.W.'s parents, and ordered that R.W. receive counseling.  The respondent appealed, without having filed a posttrial motion.

ANALYSIS

The respondent contends that the court's decision to adjudge R.W. to be neglected was against the manifest weight of the evidence.

A child may be found neglected if her environment is injurious to her welfare.  705 ILCS 405/2--3(1)(b) (West 2008).  On appeal, a trial court's finding of neglect will not be reversed unless it was against the manifest weight of the evidence.  In re Faith B., 216 Ill. 2d 1, 832 N.E.2d 152 (2005).  A court's ruling is against the manifest weight of the evidence only if the opposite conclusion is clearly evident.  Faith B., 216 Ill. 2d 1, 832 N.E.2d 152.

Generally, the neglect of a juvenile is defined as a failure to exercise the care that the circumstances warrant.  In re Arthur H., 212 Ill. 2d 441, 819 N.E.2d 734 (2004).  Neglect includes wilful as well as unintentional disregard of duty and takes its meaning from the context of the surrounding circumstances.  Arthur H., 212 Ill. 2d 441, 819 N.E.2d 734.  Although an injurious environment does not have a fixed definition, it includes the breach of a parent's duty to ensure a safe and nurturing environment for the minor.  Arthur H., 212

8

Ill. 2d 441, 819 N.E.2d 734.

We observe that the neglect statute at issue is contained within the Juvenile Court Act of 1987 (Act) (705 ILCS 405/1--1 et seq. (West 2008)).  The stated purpose of the Act is, in pertinent part:

> (1) *** to secure for each minor subject hereto such care and guidance, preferably in his or her own home, as will serve the safety and moral, emotional, mental, and physical welfare of the minor and the best interests of the community; to preserve and strengthen the minor's family ties whenever possible, removing him or her from the custody of his or her parents only when his or her safety or welfare or the protection of the public cannot be adequately safeguarded without removal ***. ***

> (2) In all proceedings under this Act the court may direct the course thereof so as promptly to ascertain the jurisdictional facts and *fully to gather information bearing upon the current condition and future welfare of persons subject to this Act.*  This Act shall be administered in a spirit of humane concern, not only for the rights of the parties, but also for the fears and the limits of understanding of all who appear before the court.

> (3) ***

> * * *

> (c) The parents' right to the custody of their child shall not prevail when the court determines that

9

it is contrary to the health, safety, and best

interests of the child.

(4) This Act shall be liberally construed to carry out

the foregoing purpose and policy." (Emphasis added) 705

ILCS 405/1--2 (West 2008.) See also In re O.S., 364 Ill.

App. 3d 628, 848 N.E.2d 130 (2006).

In other words, one purpose of the Act is to assist parents who have engaged in allegedly flawed parenting so that their flaws may be corrected while ensuring that their children are safe and adequately cared for.

In this case, we note that there were no prior adjudications and there were no court orders requiring respondent's cooperation with DCFS. We also note that by the time DCFS filed the neglect petition on June 26, 2009, the problems regarding R.W.'s environment, which were alleged to have occurred in May 2009, were no longer problems. Indeed, on the day it was filed most of the allegations of the petition were either outright false or misleading because of significant factual omissions. In fact, the Act had worked as it was intended, inasmuch as the respondent had been apprised of problems with the porch, basement and backyard that may have placed her child at risk, and she had remedied the problems. Specifically, there had been two earlier allegations of a dirty house that were determined to be unfounded because the respondent had cleaned up the house. Following this third allegation of a dirty house, the respondent and her friends cleaned and organized the house, including the basement, as well

10

as the backyard. Although there was evidence there had been clutter in the backyard, the respondent testified that some of this clutter belonged to Rusty W., who had not removed it following the couple's separation. Moreover, the record shows that by the time the petition was filed, the backyard clutter had been cleaned up and other problems with the house had been remedied.

Although Galassi testified that R.W. reported that she played in dirty water in the basement, DCFS was unable to confirm this allegation because of the items blocking the basement stairway -- a condition that has been corrected. Nonetheless, there was testimony that the water was caused by excessive spring rain and that it had been mopped up by the respondent and her friends before the petition was filed.

We acknowledge that the record shows that the respondent was fined for code violations, as alleged in the neglect petition. However, Wamsley's testimony showed that the conditions resulting in the fine had been cleaned up more than a month before the petition was filed.

We further observe that there was no evidence of the respondent's lack of cooperation with DCFS, as was alleged in the petition. Although the respondent initially refused DCFS entry to the home on May 12, 2009, when her daughter was home sick, she called Galassi later that day and allowed entry the following day. The respondent also told Galassi that she could enter the home on May 22, 2009, but, on her attorney's advice, she later

11

withdrew her earlier consent to a search of her home without a warrant. DCFS elected not to get a warrant, choosing instead to go behind respondent's back to execute a "safety plan" with the husband who was divorcing her - - a plan that removed the child from the mother without any court involvement.

We note that the respondent had a constitutional right to withdraw her earlier consent and to insist that DCFS obtain a warrant. See People v. Prinzing, 389 Ill. App. 3d 923, 907 N.E.2d 87 (2009); People v. Baltazar, 295 Ill. App. 3d 146, 691 N.E.2d 1186 (1998). The exercise of the respondent's constitutional right, on the advice of counsel, to be free from a warrantless search of her home could not be construed as lack of cooperation with DCFS, particularly since she was under no court-ordered obligation to cooperate at that time.

In summary, all of the allegations of an injurious environment in the neglect petition had been cleaned up before the petition was filed. Consequently, we hold that the trial court's finding of neglect was against the manifest weight of the evidence because the opposite conclusion was clearly evident from the record. See Faith B., 216 Ill. 2d 1, 832 N.E.2d 152. The court's observation that this had been a recurring problem does not make a fear of relapse more than speculative. Furthermore, this finding was contrary to one of the purposes of the Act. See 705 ILCS 405/1--2 (West 2008); O.S., 364 Ill. App. 3d 628, 848 N.E.2d 130.

## CONCLUSION

12

For the foregoing reasons, we reverse the judgment of the Peoria County circuit court adjudging R.W. to be neglected and remand the cause for further proceedings consistent with this opinion.

Reversed and remanded.

WRIGHT, J., concurs.

JUSTICE SCHMIDT, dissenting:

The record shows that respondent keeps a filthy house and a rodent-infested yard. When cited by authorities, she temporarily corrects things and then the conditions recur. There is a child living under these conditions. The majority holds that no reasonable person could find these facts create an injurious environment for a child.

The idea of the Act is to help respondent learn appropriate parenting skills. Parenting skills include housekeeping skills. The majority's conclusion "that this had been a recurring problem does not make a fear of relapse more than speculative" defies common sense. Slip op. at 12.

With respect to respondent's failure to allow DCFS to confirm the condition of the basement, the majority points out that there is no court order requiring respondent to do so. It was alleged that respondent failed to cooperate with DCFS. There is no allegation that respondent was guilty of contempt of court for violating a court order. By way of example, there is also no court order in effect requiring the respondent to feed her minor child. The absence of a prior court order has nothing to do with whether or not the child was neglected or whether the respondent was cooperating or otherwise taking appropriate action toward the care of the child.

The court's finding of neglect is supported by the evidence. It is undoubtedly the first step toward helping respondent develop appropriate parenting skills for the safety and welfare of her

child.  This is consistent with the intent of the Act.  Without the neglect finding, the court is powerless to help respondent or the child.

The majority's finding that no reasonable person could find that a parent who keeps a child in a filthy home is not guilty of neglect by virtue of providing an injurious environment defies all reason.  What happens to this child when the code enforcement officer or others fail to observe the conditions?  The respondent obviously needs help with parenting skills.  The trial court put the wheels in motion to provide her with that help.  The majority has put a stop to that.

The majority substitutes its judgment for that of the trial court.  This ignores the appropriate standard of review.  I, therefore, dissent.